IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MIGUEL KELLER § | |
| § | |
| V. § | |
| § | Civil Action No. 4:08-cv-01236 |
| MARINER ENERGY, INC.; § | |
| ISLAND OPERATING COMPANY, INC.;§ | |
| UNITED PRODUCTION AND § | |
| CONSTRUCTION SERVICES, INC.; § | |
| POWER PERFORMANCE, INC. and § | |
| LIVING QUARTERS § | |
| TECHNOLOGY, INC. § | |
| MARINER ENERGY RESOURCES, INC. § | JURY DEMANDED |

TO THE HONORABLE JUDGE HITTNER:

COMES NOW Plaintiff Miguel Keller ("Mr. Keller") and files this Response to Defendant Island Operating Company Inc.'s ("Island Operating") Motion for Summary Judgment and in support would show as follows:

### NATURE OF CASE AND SUMMARY OF RESPONSE

1.  Mr. Keller was hired by Shamrock Management L.L.C. on August 17, 2007 ("date of the incident") as a production worker and sent via helicopter to the Eugene Island 342 C platform (or "the platform") in the Gulf of Mexico to assist Defendant Island Operating in oil and gas production operations. Defendant Mariner Energy, Inc. engaged Defendant Island Operating to serve as the oil and gas production operator on the Eugene Island 342 C platform. On the date of the incident, Island Operating controlled Mr. Keller's scope of employment and directed him to clean up after ongoing construction efforts in preparing the platform for arrival of a drilling rig. Per Coast Guard Regulations and assumed legal responsibilities, Island Operating was directly responsible for ensuring that the Eugene Island 342 C platform was free from workplace hazards

that might endanger a production worker such as Mr. Keller.

2. Island Operating was required to and did conduct a Job Safety Analysis ("JSA") of the Eugene Island 342 C platform aimed at identifying safety hazards existing on the job site. Furthermore, Island Operating representatives Danzel Marcantel and Clay Montgomery conducted a workplace orientation with Mr. Keller on the date of the incident intended to inform Mr. Keller of dangerous working conditions, including trip and slip hazards.

3. On August 17, 2007 at approximately 11:30 a.m., subsequent to Island Operating's JSA of the Eugene Island 342 C platform, while on duty under Island Operating Supervisor Danzel Marcantel and less than two hours after his jobsite orientation with Island Operating Supervisors Marcantel and Montgomery, Mr. Keller traversed the lavatory area of the Eugene Island 342 C platform, tripped on an unsecured, hazardous, and generally unfit step attached to the platform, and fell. Mr. Keller suffered significant injuries as a result of this workplace fall. The testimony of maritime safety expert Captain John Manders, Island Operating supervisor Danzel Marcantel, and Mr. Keller confirm Island Operating's duty to perform a thorough jobsite safety investigation, legal responsibility to Mr. Keller to provide a safe workplace, conscious undertaking of a jobsite orientation for Mr. Keller's benefit, and lack of communication to Mr. Keller regarding the hazardous step conditions in the Eugene Island 342 C platform area.

4. At a minimum, a sufficient fact issue exists regarding whether Defendant Island Operating neglected to meet its duties under the law and whether this failure

proximately caused Mr. Keller's injuries. Island Operating's Motion for Summary Judgment is an improper attempt at resolving these factual issues in its favor. Because a reasonable jury can conclude that Defendant Island Operating is liable for Mr. Keller's injuries, Defendant Island Operating's Motion for Summary Judgment must be denied.

## PROPER SUMMARY JUDGMENT EVIDENCE

Exhibit A: Deposition of Danzel Marcantel (Island Operating Supervisor)

Exhibit B: Affidavit of Captain Manders

Exhibit C: Expert Report of Captain Manders

Exhibit D: Deposition of Miguel Keller

## STANDARD OF REVIEW

### I. Conventional Summary Judgment Standard

5. Summary judgment is only proper "if the pleadings, depositions, answer to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving the absence of existence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317 (1986). The burden then shifts to the non-movant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183 (5th Cir. 1991). A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict in favor of the non-mover. *Roberson v. Alltell Info. Servs.*, 373 F.3d 647 (5th Cir. 2004). Once the non-movant demonstrates the genuine issue of material fact,

summary judgment must be denied. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

## ARGUMENTS AND AUTHORITIES

**II. There is no such thing as operator immunity, a production operator like Island Operating may always be held liable for unreasonably exposing persons under its supervision to risk of injury**

6. The general rule that an independent contractor does not owe a duty to other independent contractors does not exempt an operator from liability if its negligence poses an unreasonable risk to others also involved in operations. *See Lemaire v. Ciba-Geigy Corp.,* 739 So.2d 336 (La. App. 1st Cir. 2001); *St. Hill v. Tabor,* 542 So.2d 499, 502 (La. 1989); *Harris,* 455 So.2d at 1369; *Walker v. Union Oil Mill, Inc.,* 369 So.2d 1043, 1047 (La. 1979). Island Operating's myopic duty-risk analysis of construction operations on the platform improperly ignores established maritime standards regarding operational safety and discards the actual circumstances highlighting Defendant Island Operating's duty to not unreasonably expose Mr. Keller to risk of workplace injuries.

*Island Operating Owed Mr. Keller a Duty*

7. In general, the operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. *Campbell v. Louisiana Department of Transportation and Development,* (La. 1995); *St. Hill v. Tabor,* 542 So.2d 499, 502 (La. 1989); *Harris,* 455 So.2d at 1369; *Walker v. Union Oil Mill, Inc.,* 369 So.2d 1043, 1047 (La. 1979). A duty may be imposed by legislation, ordinance or rule of law. *Cormier v. T.H.E. Ins. Co.,* 745 So.2d 1 (La. 1999).

8. The Code of Federal Regulations imposed a duty upon Island Operating directly applicable to this incident:

> TITLE 33 CFR - NAVIGATION AND NAVIGABLE WATERS.
> CHAPTER I - COAST GUARD, DEPARTMENT OF HOMELAND SECURITY.
> PART 142 - WORKPLACE SAFETY AND HEALTH.
> Subpart A - General.
>
> Sec. 142.4 Duties of lessees, permittees, and persons responsible for actual operations.
> (a) Each holder of a lease or permit under the Act shall ensure that all places of employment within the lease area or within the area covered by the permit on the OCS are maintained in compliance with workplace safety and health regulations of this part and, in addition, free from recognized hazards.
> (b) Persons responsible for actual operations, including owners, operators, contractors, and subcontractors, shall ensure that those operations subject to their control are conducted in compliance with workplace safety and health regulations of this part and, in addition, free from recognized hazards.
> (c) ``Recognized hazards'', in paragraphs (a) and (b) of this section, means conditions which are:
> (1) Generally known among persons in the affected industry as causing or likely to cause death or serious physical harm to persons exposed to those conditions; and
> (2) Routinely controlled in the affected industry.

33 C.F.R. § 142.4. Captain John Manders, an expert in maritime safety, analyzed the duty imposed by these regulations on Island Operating and concluded that Island Operating breached its duty as follows:

> 2. The failure to secure a step or steps aboard the Eugene Island 342 C platform so that a step does not slip forward underfoot when trodden upon is generally known among persons in the offshore oil & gas industry as causing or likely to cause death or serious physical harm to persons stepping or treading on inadequately secured steps.
> This unsafe condition is a "Recognized Hazard" that should be routinely controlled in the offshore oil & gas industry.
>
> 4. On August 17, 2007, Island Operating Company, Inc. was the operator of the

5

>Eugene Island 342 C platform under contract to Mariner Energy, Inc.
>
>7. On August 17, 2007, each of the above named defendants in this matter was responsible for actual operations, including owners, operators, contractors, and subcontractors, and each should have ensured that those operations aboard the Eugene Island 342 C platform subject to their control were conducted in compliance with workplace safety and health regulations and, in addition, free from recognized hazards.
>
>8. Based on the course of conduct of Defendants, the identification of the unwelded and unsecured steps would have resulted in either remedying of the hazardous condition by the operator of the platform or communication to workers such as Mr. Keller to avoid using those steps.

*See* Exhibit "B", Affidavit of Captain Manders; Exhibit "C", Expert Report of Captain Manders.

9. Furthermore, Island Operating's allegations of negligence against the construction contractors are insufficient to relieve Island Operating of the obligations it owed Mr. Keller under law. A similar finger-pointing summary judgment argument was rejected in *Watkins v. Exxon Mobil Corp. and Dolphin Svcs. Inc.*, 2005 WL 2076410 (S.D. Tex. 2005) (applying substantive Louisiana law due to proximity of operations). In *Watkins*, the plaintiff was injured on a drilling platform and asserted claims against Exxon including a claim that, as controller of the premises, Exxon failed to maintain the platform properly. Exxon argued that it was entitled to summary judgment on the basis that it owed no duty to Watkins, an independent contractor, and that any negligence causing Plaintiff's injuries was the result of another contractor's conduct. *Id.* at *1, 2. The Court rejected Exxon's argument and held that Exxon's arguments were insufficient to dispose of Plaintiff's premises liability theory and, as such, summary judgment must be denied. *Id*. at 3.

*Negligence within the spheres of Island Operating's own activities*

10. The general maritime law recognizes further that a maritime defendant owes a duty to avoid negligent actions within the sphere of activities over which it has some control. *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996) (time charter owes a hybrid duty, arising from tort and contract law to exercise control in a reasonably prudent manner within the sphere of activity over which it exercises at least partial control). Here, Island Operating was charged with maintaining a platform free from hazards. Island Operating acknowledged this duty owed to Mr. Keller by conducting daily JSAs of Mr. Keller's workplace, requiring Mr. Keller to sign off on the JSA of the premises that Mr. Keller was not permitted to personally conduct, and by engaging in a workplace orientation with Mr. Keller two hours prior to the incident.

*Island Operating Directed Safety Analysis/Hazard Orientation for Keller's Jobsite*

11. Island Operating's production supervisor, Danzel Marcantel, confirmed the purpose of Island Operating's daily worksite safety investigation:

```
                              24
22  Q   What's a JSA?
23  A   It's --
24      MR. BROUSSARD:
25          Don't put that there because I'm going

                              25
 1          to want to make some copies for them.
 2  A   -- job safety analysis.
 3      MR. BROUSSARD:
 4          We'll keep it right here.
 5  A   Before we start a job we'll figure out kind of
 6      like the three -- whoever is going to be
 7      involved in the job, kind of brainstorm what's
 8      fixing to happen so you can look for anything
 9      that might cause you problems, the safest way
```

```
10     to attack it and the safest outcome of the job,
11     and you go over it between all of them and try
12     to cover everything that could happen.
                          33
20     Was there a manager or managers who had some
21     responsibility for actually eyeballing the
22     platform from time to time to look for
23     problems?
24        MR. BROUSSARD:
25           Object to the form of the question. Go
                          34
 1     ahead and answer it if you can.
 2  A  On the production end I would always -- we
 3     would -- as production personnel, we'd go over
 4     our equipment daily.
                          35
 3  Q  Now, when you do a walk-through, a checklist,
 4     do you actually mark it off, document it?
 5  A  We do -- we would do a weekly, but as you do
 6     your daily, as a production hand you know what
 7     you need to check, your levels and your
 8     vessels, and there's nothing written down.
```

Exhibit "A", Deposition of Marcantel, p. 24:22-25:12; 33:20-34:4; 35:3-8.

12.     On August 17, 2007, Island Operating conducted a JSA prior to Mr. Keller's arrival at the platform:

```
                          27
 6  Q. When you were out there on -- on the day of
 7  the accident, did you have a JSA meeting that morning?
 8     A. Yes, sir. As soon as I arrived on the
 9  platform, I went downstairs and I met with the lead
10  operator and I met with the Mariner safety rep or the
11  Mariner representative and I did an orientation.
12        They -- I watched an orientation film and
13  then assigned off, you know, to my JSA and what we
14  would be doing actually that day.
15     Q. Who conducted the JSA meeting that morning?
16     A. Well, I arrived around 9:30. They already had
17  that. But when I went downstairs and met with the
18  lead operator and the foreman, they gave me a personal
19  job, you know, description, what I was going to be
20  doing, and an orientation to the platform. I walked
```

```
21  around with the lead operator, you know, showing me
22  what I was going to be doing and actually what was
23  going on and, of course, I questioned him about what
24  kind of production's going on and -- and, you know,
25  the overall job, so to speak.
                            28
 1    Q.  Who was the lead operator?
 2    A.  Denzel Markentell or Denzel -- I think it's
 3  Denzel Markentell.  I'm not for sure.
```

Exhibit "D", Deposition of Keller, p. 27:6-28:3.

Thereafter, Island Operating represented to Mr. Keller what hazards they had uncovered during the JSA on the morning of the incident and required that Mr. Keller sign off on the JSA:

```
                            71
21  Q.  Did -- were you -- you said they talked about
22  the job safety analysis?
23    A.  Yes, sir.
24    Q.  That had already been conducted that morning?
25    A.  Prior to me, yes, because, I mean, obviously


                            72
 1  they did, you know, a safety meeting prior to me
 2  landing on the platform.
 3    Q.  But they went over this -- what was discussed
 4  in the safety meeting?
 5    A.  Yes, sir.
 6    Q.  What do you recall about that?
 7    A.  They was talking about construction, was going
 8  to be doing some welding, and they was going to be
 9  doing some backloading which in terms mean they were
10  going to, you know, move equipment from the platform
11  to the boat, whichever, you know -- that would have
12  been -- I don't know what they actually moved but --
13  and that was basically what we discussed.


14  Q.  Did you have to sign any paperwork?
15    A.  Yes, sir.
16    Q.  What did you sign?
```

```
17    A.  I signed the JSA and I also signed the log-in
18  book, which that's something you do every time you go
19  on a platform.  You sign in.
```

                            73

```
 2    Q.  And you actually signed the JSA?
 3    A.  Yes, sir.
 4    Q.  Did you read the JSA?
 5    A.  Yes.
 6    Q.  What do you recall it saying?
 7    A.  I recalled it saying that construction was
 8  going to be doing some welding and that the rest of
 9  the, you know, operators and whoever was out there was
10  going to be picking up cleaning the platform.
11    Q.  And did it say anything about slips, trips,
12  falls, anything like that?
13    A.  Yes, because they did have trip hazards.  They
14  had welding leads out on the platform.  You know, they
15  had slings out on the platform, tools and just
16  toolboxes.  I mean, it was just -- things were
17  everywhere, you know.  It's a construction job.
```

Exhibit "D", Deposition of Keller, p. 71:21-72:19; 73:2-17.

13.     In addition to warranting the JSA that Island Operating had conducted, Island Operating assumed the responsibility for acclimating Mr. Keller to potential hazards on the platform.

                            10
```
20  Q   Chance Keller worked for another company?
21  A   Yes.
22  Q   His job was different than your job?
23  A   He was flown out there to be my third man.
24  Q   When Mr. Keller came out, were you responsible
25      for doing any kind of orientation for the rig
```
                            11
```
 1      platform?
 2  A   Yes.  We sat down with myself, him, and the
 3      foreman was also present.
```

                            37
```
11  Q   So as part of the orientation did you do any
```

```
12    physical walk-through or have one of your hands
13    do a physical walk-through with him?
14  A  Yeah.  He was -- he was put with Clay
15    Montgomery.
```

Exhibit "A", Deposition of Marcantel, p. 10:20-11:3; 37:11-15.

```
                             79
10   Q. Were you given an orientation of the rig when
11 you got there?
12    A. Yes, sir.
13    Q. You were told, "Okay, this is where the
14 bathroom is, this is where the galley is, this is
15 where the sleeping quarters are"?
16    A. Yes, sir.
17    Q. Were you -- were you told that, or were you
18 actually walked around and shown?
19    A. Well, I was walked around; and, you know, it
20 was explained to me.
21    Q. Okay.  So, prior to the time that you actually
22 started working, were you -- did you go up there to
23 the quarters in the building?
24    A. I went up topside and walked around the top of
25 the platform.  I didn't go to the buildings.  I
                             80
 1 noticed the buildings.  You know, obviously, living
 2 quarter buildings, they have the buildings; and then
 3 galley's usually white.  The buildings are usually
 4 blue.  Just depends.  But, I mean, I knew the
 5 location, where everything was at.
 6    Q. When you walked up there, did you go by
 7 yourself or were you given a tour, basically?
 8    A. I went up with Markentell and I brought my bag
 9 up and I set it inside the washroom.
                             106
19   Q. On the day of the incident, you said you --
20 you had a safety briefing that covered slips, trips,
21 and falls; is that correct?
22    A. Yes, sir.
```

Exhibit "D", Deposition of Keller, p. 79:10-80:9; 106:19-22.


14.     As the summary judgment evidence substantiates, Island Operating was

required to and did conduct a Job Safety Analysis ("JSA") of the Eugene Island 342 C platform with the specific intent of identifying safety hazards existing on the job site affecting production workers such as Mr. Keller. Furthermore, Island Operating representatives Danzel Marcantel and Clay Montgomery conducted a workplace orientation with Mr. Keller on the date of the incident intended to inform Mr. Keller of dangerous working conditions, including trip and slip hazards. Coast Guard Regulations, case law and Island Operating's own course of conduct confirm Island Operating's duty to Mr. Keller concerning existing hazards on this jobsite. *See Cormier v. T.H.E. Ins. Co.*, 745 So.2d 1 (La. 1999).

15. The undisputed evidence indicates that subsequent to Island Operating's JSA of the Eugene Island 342 C platform, while on duty under Island Operating Supervisor Danzel Marcantel and less than two hours after his jobsite orientation with Island Operating Supervisors Marcantel and Montgomery, Mr. Keller traversed the lavatory area of the Eugene Island 342 C platform, tripped on an unsecured, hazardous, and generally unfit step attached to the platform. Based on the course of conduct of Defendants, the identification of the unwelded and unsecured steps would have resulted in either remedying of the hazardous condition by the operator of the platform or communication to workers such as Mr. Keller to avoid using those steps. Exhibit "B", Affidavit of Captain Manders. A reasonable jury can conclude that Defendant Island Operating neglected to meet its duties under the law and that this failure proximately caused Mr. Keller's injuries. Defendant Island Operating's Motion for Summary Judgment should be denied. *Roberson v. Alltell Info. Servs.*, 373 F.3d 647 (5th

Cir. 2004)

*Island Operating failed to reasonably carry out the obligation of communicator it undertook*

16. Further, one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if:

    a) failure to exercise reasonable care increases the risk of such harm; or

    b) the party has undertaken to perform a duty owed by the other to the third person; or

    c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

This is known by Supreme Court as the "Good Samaritan" doctrine. *United States v. Empresa de Viacao Aerea Rio Grandense,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

17. A reasonable jury may find that Island Operating failed to exercise reasonable care for its activities in negligently ignoring true information about the platform's conditions, including the hazardous steps. The admissible testimony by affidavit of marine operations expert Captain John Manders simply provides further support for the factual basis of Island Operating's negligence. *See* Exhibit "B", Affidavit of Captain Manders; Exhibit "C", Expert Report of Captain Manders.

## PRAYER

WHEREFORE, PREMISES CONSIDERED**,** Mr. Keller prays that the Court DENY Defendant Island Operating Company Inc.'s Motion for Summary Judgment, and grant

such other and further relief to which he may be justly entitled.

        Respectfully submitted,

        **DOYLE RAIZNER LLP**

        _____
        MICHAEL PATRICK DOYLE
        State Bar No. 06095650
        One Houston Center
        1221 McKinney Suite 4100
        Houston, Texas 77010
        Phone: (713) 571-1146
        Fax:   (713) 571-1148
        **ATTORNEY-IN-CHARGE**
        **FOR PLAINTIFF MIGUEL KELLER**

OF COUNSEL:
E.A. "Trey" Apffel, III
E. A. Trey Apffel, III, P.C.
1201 25th Ave N
Texas City, TX 77590-5525

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 21st day of July, 2009, via hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, ecf filing, and/or facsimile, pursuant to the Federal Rules of Civil Procedure:

>Mr. Hal James Broussard
>Broussard & Kay, LLC
>557 Jefferson Avenue
>Lafayette, Louisiana 70502
>**ATTORNEY FOR DEFENDANT**
>**ISLAND OPERATING COMPANY, INC**
>
>Mr. Bradley L. DeLuca
>Ms. Brigid Ashcraft
>Johnson, DeLuca, Kennedy & Kurisky
>1221 Lamar Street, Suite 1000
>Houston, Texas 77010
>**ATTORNEY FOR DEFENDANT**
>**MARINER ENERGY, INC.**
>
>Mr. Jeromy Hughes
>Brown Sims, P.C.
>Tenth Floor, 1177 West Loop South
>Houston, Texas 77027-9007
>**ATTORNEY FOR DEFENDANT**
>**UNITED PRODUCTION & CONSTRUCTION**
>**SERVICES, INC.**
>
>Mr. Frank Piccolo
>Preis & Roy
>24 Greenway Plaza, Suite 2050
>Houston, Texas 77046
>**ATTORNEY FOR DEFENDANT**
>**LIVING QUARTERS TECHNOLOGY, INC.**

Mr. Chester Makowski
Royston, Rayzor, Vickery & Williams, L.L.P.
1001 McKinney, Suite 1100
Houston, Texas 77002-6418
**ATTORNEY FOR DEFENDANT
POWER PERFORMANCE, INC.**

_____
Michael Patrick Doyle